**HOFFER v. EASTLAND NAT. BANK et al.**
**No. 2320.**

Court of Civil Appeals of Texas. Eastland.
Jan. 15, 1943.

Rehearing Denied Feb. 12, 1943.

276

See, also, 153 S.W.2d 345.

Strickland, Ewers & Wilkins, of Mission, and Turner & Seaberry, of Eastland, for appellant.

Milburn McCarty, of Eastland, for appellee Eastland Nat. Bank.

Frank Sparks, of Eastland, for appellees Kirk.

GRISSOM, Justice.

Eastland National Bank sued Arnold Kirk and T. B. Hoffer as drawer and acceptor, respectively, of a draft for $600 payable to the bank, payment of which was refused by Hoffer. Hoffer denied liability on the ground that he had not accepted the draft. He also pleaded want of consideration. He alleged his acceptance of the draft, if any, was an accommodation acceptance, and that, at most, he was only secondarily liable because he received nothing of value from the transaction. He impleaded J. P. Kirk, mother of Arnold Kirk, and her husband, Frank Kirk. Hoffer sought judgment against Arnold Kirk and Mrs. J. P. Kirk for the amount of any judgment that might be rendered against him in favor of the bank.

On June 26, 1940, T. B. Hoffer sent the following telegram:

"Corpus Christi Tex
"Arnold Kirk
"Eastland Tex
"Draw draft Six Hundred Dollars Through First State Bank and Trust Company Mission Tex.
"T. B. Hoffer."

When the telegram was received by Arnold Kirk, he took it to the Eastland National Bank and drew the following draft:

C|  Eastland National Bank
U|              Eastland, Texas, Jun 26, 1940
S| ——————————— pay to the order of
T| Eastland National Bank $600.00 ....
O|     Eastland, Texas
M| Six Hundred and no/100 .... Dollars
E| Value received and charge to account
R| of — With Exchange
S|              (Signed)  Arnold Kirk

D|
R|  To T. B. Hoffer
A|  % 1st State Bank & Tr. Co.
F|  Mission, Texas
T|

The bank alleged and the undisputed testimony of Albert Taylor, the active vice-president of said bank, who handled the transaction for the bank, and of Arnold Kirk, is to the effect that Arnold Kirk presented the telegram to said representative of the bank and stated to Mr. Taylor that Hoffer was indebted to him in excess of $600; that immediately prior to receiving the telegram he had talked with Hoffer over the telephone and told Hoffer he was trying to close a business deal and needed $600 and asked Hoffer to let him have that amount of money and to send him a telegram authorizing him to draw a draft on Hoffer for $600 so that he could obtain $600 on the draft; that Hoffer agreed to do so and promptly thereafter sent said telegram. Mr. Taylor testified he knew the financial responsibility of Arnold Kirk and T. B. Hoffer; that he would not have advanced $600 to Arnold Kirk without security; that he knew Hoffer was financially responsible; that the bank paid the draft to Arnold Kirk, relying on the promise and undertaking of Hoffer, as set out in said telegram; that the draft was in the regular course of business presented to Hoffer and he refused to pay it.

Hoffer's allegations and testimony are in substance that he sent the telegram to Arnold Kirk, as Kirk had requested over the telephone, so that Kirk could get $600 on the draft authorized by Hoffer's telegram but that he was not indebted to Arnold Kirk; that he told Kirk he would not pay the draft and that Kirk must make arrangements to pay the draft by the time it was returned and that Kirk agreed to do so.

The testimony of Albert Taylor and Arnold Kirk, and the bank's records show that when the bank cashed the draft for $600, $441.94 was credited to the J. P. Kirk account. There were three items for $42.01, $41.05, and $75, respectively, that were not credited to said account. The $75 appears to be cash paid to Arnold Kirk at the time the deposit was made. Mr. Taylor and Arnold Kirk testified, in substance, that it was their recollection that the other two items deducted from the $600 went to pay drafts for said amounts then in the bank and drawn on Arnold Kirk. They further testified that Arnold Kirk had two accounts in the Bank, one in his own name and the other in the name of J. P. Kirk, and that Mrs. J. P. Kirk, Arnold's mother, had nothing to do with said account. That when the J. P. Kirk account was previously opened by Arnold Kirk he instructed the bank not to honor any check drawn on said account except by Arnold Kirk; that such notation was made on the

account and the instruction observed by the bank. There was no evidence that the bank got any part of the $600.

The Court instructed the jury to return a verdict for the Bank against Hoffer and Arnold Kirk and in favor of J. P. Kirk and Frank Kirk against Hoffer on his cross-action. The Court then submitted, in Hoffer's action against Arnold Kirk, the following issue: "Do you find from a preponderance of the evidence that the draft drawn by Defendant, Arnold Kirk, on Defendant, T. B. Hoffer, was not for paying an indebtedness, if any, due by said T. B. Hoffer to said Arnold Kirk?" The jury answered "It was for paying an indebtedness due by T. B. Hoffer to Defendant, Arnold Kirk."

The Court rendered judgment for the Bank against Hoffer and Arnold Kirk and against Hoffer on his cross action against Arnold, J. P. and Frank Kirk. Hoffer has appealed.

Hoffer's first point is that the Court erred in instructing a verdict in favor of the bank against Hoffer because the bank had elected to stand alone on the draft and Hoffer's alleged telegraphic acceptance, as such, and asserts that Hoffer's telegram was not an acceptance of the draft. The last sentence of the first point reads: "Plaintiff Bank, being payee in the draft, was not a holder in due course."

Of course, if Hoffer did not accept the draft he is not liable for its payment. Article 5941, Vernon's Ann.Civ.St., provides:

"Sec. 132. The acceptance of a bill is the signification by the drawee of his assent to the order of the drawer. The acceptance must be in writing and signed by the drawee. * * *."

"Sec. 134. Where an acceptance is written on a paper other than the bill itself, it does not bind the acceptor except in favor of a person to whom it is shown and who, on the faith thereof, receives the bill for value.

"Sec. 135. An unconditional promise in writing to accept a bill before it is drawn is deemed an actual acceptance in favor of every person who upon the faith thereof, receives the bill for value."

"Sec. 138. A bill may be accepted before it has been signed by the drawee, or while otherwise incomplete * * *."

█ Hoffer's testimony shows he sent the telegram to Arnold Kirk for the purpose of enabling Kirk to take the telegram to a bank and obtain $600 from the bank by drawing a draft on Hoffer for that amount. The testimony further shows. that Hoffer's telegram was shown to Mr.. Taylor, and that on the faith of that telegram the bank paid $600 for the draft. We consider the telegram an unconditional promise in writing to accept the draft before it was drawn and therefore deem it an actual acceptance by Hoffer in favor of the bank, to whom it was shown and who,. on the faith thereof, received the draft for value. Elliott v. First State Bank of Fort Stockton, 105 Tex. 547, 152 S.W. 808; Conn v. San Antonio National Bank, Tex. Com.App., 249 S.W. 1045; Texas State Bank v. Press Pub. Co., Tex.Civ.App., 250 S.W. 464; 6 Tex.Jur. 752; 8 Amer.Jur. 518; First National Bank of Tulsa v.. Muskogee Pipe Line Co., 40 Okl. 603, 139 P. 1136, L.R.A. 1916B, 1021.

█ Appellant's contention that the bank, being the payee in the draft, is not a "holder in due course" must be sustained. It follows that want of consideration could be properly pleaded as a defense and, if supported by evidence, sustained. Art.. 5935, Sec. 58, provides: "In the hands of. any holder other than a holder in due course, a negotiable instrument is subject to the same defenses as if it were non-negotiable * * *."

Art. 5933, Sec. 28, provides: "Absence or failure of consideration is matter of defense as against any person not a holder in due course * * *."

Article 574 (apparently repealed by Rules. of Civil Procedure, Acts 1939, 46th Leg.,. page 201, Sec. 1) provided in part: "The defendant in any suit upon a written instrument may plead want or failure, or partial failure of consideration, where such written instrument shall remain in the possession of the original payee * * *."

In J. I. Case Threshing Machine Co. v. Howth, 116 Tex. 434, 437, 293 S.W. 800, the Supreme Court in an opinion by Judge Greenwood said:

"Howth's right to the peremptory instruction necessarily follows from the conclusion that the payee, plaintiff, to whom. the completed note was originally delivered,. was not 'a holder in due course,' as defined. in the Negotiable Instruments Act.

"Plaintiff was the 'holder' of the note as the payee in possession of it (section 191,. article 5948), and was entitled to sue there-

on (section 51, article 5935). Plaintiff not being 'a holder in due course,' the note was *subject to every defense to which it would be subject if it were nonnegotiable. Section 58, article 5935.*

\*  \*  \*  \*  \*

"There are other provisions of our statutes which persuade us that in Texas the payee, who is an immediate party to a negotiable note on its original completion, is not intended to have the rights of 'a holder in due course.' \* \* \* Section 28 of article 5932 makes partial or total failure of consideration a pro tanto or complete defense 'as against any person not a holder in due course.' Article 574 of the Revised Statutes makes partial or total failure of consideration available to a defendant in every suit on a written instrument, where it 'shall remain in the possession of the original payee or obligee.' It is our plain duty to give effect to both section 28 of article 5932 and to the quoted provision of article 574, as enacted by the same Legislature at the same time, if possible. Cole v. State, 106 Tex. [472], 474, 170 S.W. 1036. The two articles can both be made operative, without repugnancy, only by recognizing that the original payee is not 'a holder in due course,' as defined in section 52 of article 5935."

In *Williams v. Jones*, 122 Tex. 61, 68, the Supreme Court said: "Williams, being an original party to Note No. 5 (the instrument sued on) is not a holder in due course (Brinker v. First National Bank, Tex.Com.App., 37 S.W.2d 136; J. I. Case Machine Company v. Howth, 116 Tex. 434, [293 S.W. 800]), and therefore such note is subject to the same defenses as if it were non-negotiable (Neg. Inst. Act, Art. 5935, Sec. 58; Brinker v. First National Bank, supra; J. I. Case Machine Co. v. Howth, supra), and is discharged by any act which will discharge a simple contract for the payment of money. Art. 5939, Sub. 4, Rev.Stat., 1925."

See also Howth v. J. I. Case Threshing Machine Co., Tex.Civ.App., 280 S.W. 238; Southwest Contract Purchase Corporation v. McGee, 120 Tex. 240, 36 S.W.2d 978, and, Id., Tex.Civ.App., 296 S.W. 912; Foster v. Security Bank & Trust Company, Tex.Com.App., 288 S.W. 438; Kimball-Krough Pump Co. v. Judd, Tex.Civ.App., 88 S.W.2d 579, 583; and 6 Tex.Jur. 695.

But, regardless of the fact that the bank is an "immediate party" to the instrument and the payee therein and is not a holder in due course, it does not follow that Hoffer's evidence sustained or even raised the issue of want of consideration against the bank. The bank is a holder for value. Sec. 29 of Art. 5933 provides: "An accommodation party is one who has signed the instrument as maker, drawer, acceptor, or indorser, without receiving value therefor, and for the purpose of lending his name to some other person. Such a person is liable on the instrument to a holder for value, notwithstanding such holder at the time of taking the instrument knew him to be only an accommodation party." Hoffer's purpose in sending the telegram and, as we have held, in accepting the draft was to enable the drawer, Arnold Kirk, to obtain $600 from the bank on the draft. True, Hoffer did not get any of the $600. It was not required that he do so in order for him to be liable to the bank. Sec. 29, Art. 5933, supra. Hoffer's telegram enabled Kirk, the accommodated party according to Hoffer's contention, to obtain $600 and caused the bank to part with $600. This was a valuable consideration binding on Hoffer, as between Hoffer and the bank. Although the bank was named as the payee in the draft it was not the accommodated party and as a holder for value, the bank could enforce the draft against Hoffer, who accepted it for the accommodation of Arnold Kirk. Bonner Oil Co. v. Gaines, 108 Tex. 232, 191 S.W. 552, Ann.Cas. 1918C, 574; Anderson v. Ladd, 131 Tex. 479, 485, 115 S.W.2d 608; Gilbreath v. Cage & Crow, Tex.Civ.App., 198 S.W. 972; Thaxton v. Whitesides, Tex.Civ.App., 54 S.W.2d 1059, 1060; Cantu v. Briscoe Motor Parts, Tex.Civ.App., 79 S.W.2d 923, 924; Levy v. Kauffman, 5 Cir., 114 F. 170; 6 Tex.Jur. 659. If Hoffer's acceptance was for the purpose of paying $600 to Kirk on the debt Kirk alleged Hoffer owed him then, of course, there was consideration for Hoffer's acceptance.

We, therefore, conclude that the judgment for the bank against Hoffer and Arnold Kirk should be affirmed. We shall now consider the judgment on Hoffer's asserted cause of action against the Kirks.

As heretofore stated, the only issue submitted was whether the draft "was not for paying an indebtedness, if any, due by \* \* \* Hoffer to \* \* \* Arnold Kirk." Hoffer contends the jury's answer is without support in the testimony. This contention must be sustained. Although

there are some isolated statements which, taken alone, indicate the contrary we believe the testimony of Mr. Kirk, taken in its entirety, as well as the entire statement of facts, fails to show either a debt owing by Hoffer, individually, to Arnold Kirk, or that such asserted debt was agreed upon or regarded by Kirk and Hoffer as a consideration for Hoffer's acceptance of the draft.

Mr. Kirk testified: That about 1925 he and Robert Wolf made a contract, or contracts, with Hoffer Oil Corporation to drill some wells for it. The testimony relative to this matter is too voluminous to quote in an opinion, but the following excerpts from Kirk's testimony show the substance and purport of his testimony relative thereto when considered in its entirety:

"A. I drilled some wells for him.

"Q. For him or his Company? A. *He owned the company, it was all the same.* * * *

"Q. You say you had a contract with this company? A. Yes, there was a contract with either the company or Mr. Hoffer, it has been so long I have forgotten. * * *

"Q. Did you say it was with Hoffer or the company, or both? A. *I don't know that, it would be the same.* * * *

"Q. Did you ever make any contract at all with T. B. Hoffer personally? A. I think the contract was in my name.

"Q. I mean him personally. A. I don't know.

"Q. Did you make one with Hoffer Oil Company? A. I don't whether it was with the Hoffer Oil Company or Hoffer personally. * * *

"Q. Well, did they pay you? A. They paid me all but about $1800.

"Q. How was that balance evidenced? A. Well, they just lacked that much paying me the amount they agreed to pay.

"Q. That was in 1925; did you get a note? A. I don't remember.

"Q. Did you get a letter from them about it? A. I am sure I did. I am sure that we discussed it and corresponded about it.

"Q. Did you get a letter? A. I don't know whether I did or not, that has been fifteen or twenty years.

"Q. How is it that you remember the amount, Mr. Kirk? A. Well, I put up the amount, I put up the contracts at the bank at Gorman and borrowed the money on the contracts and they lacked that much paying them and the bank came back on me for that amount of money.

"Q. The bank would have a record of that? A. Yes. * * *

"Q. And, you owed them $1800? A. I owed them more than that, but I was supposed to pay them so much when I collected it.

"Q. And, you put the contract up at the bank? A. I didn't say that.

"Q. What did you say? A. I said I don't remember whether I did put the contract up.

"Q. How was it you say you borrowed the money? A. I borrowed the money when I was drilling the wells and was to pay them when I got this money.

"Q. How much did you borrow from the bank? Did you borrow all you had coming? A. I don't remember.

"Q. Did you ever talk to the officials of the Hoffer Oil Company about this debt? A. I talked to Hoffer about it.

"Q. When? A. Oh, a lot of times.

"Q. All right guess the best date; you can approximate it. A. Well—

"Q. Isn't it a fact that you haven't mentioned it to Mr. Hoffer since 1925? A. I am sure I have.

"Q. Tell where and when. A. I don't know where and when.

"Q. Do you remember what you said? A. Yes.

"Q. Do you remember what he said? A. No; but he has always told me when he was able to pay it he would.

"Q. What do you mean 'always'? A. Every time I talked to him and I have talked to him several times, I can't remember the exact dates and times I talked to him.

"Q. Did you ever ask him for a note for this balance? A. No.

"Q. Did you ever ask him for a letter? A. No.

"Q. You never got a note? A. No, there wasn't any use he didn't have any money until recently.

"Q. You don't remember what he said and what you said? A. Not the exact conversation only that when he got able to pay it he would pay it.

"Q. You don't remember where that was or when? A. No.

"Q. It was in conversation and not in writing? A. No, sir.

"Q. Was that mentioned when you talked to him about sending this telegram? A. Well, I will tell you, he had called me up about a week before—

"Q. Let's go ahead, you can explain your evidence— A. Did I talk to him?

"Q. Was that mentioned when you talked to him about sending this telegram? A. I don't think it was, no." (Italics ours)

■ The foregoing italicized quotations merely show an incorrect legal conclusion. Hoffer's asserted verbal agreement to pay the corporation's debt was unenforceable under the Statute of Frauds. Furthermore, there is no intimation of a consideration for such a promise. 20 Tex.Jur. 220, 223.

■ We think the situation disclosed by the entire statement of facts relative to a debt owing by Hoffer, individually, to Arnold Kirk requires us to apply the rule laid down by the Supreme Court in Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059, 1063, as follows: "From a careful examination of the cases, it appears (1) that it is the duty of the court to instruct a verdict, though there be slight testimony, if its probative force be so weak that it only raises a mere surmise or suspicion of the existence of the fact sought to be established, such testimony, in legal contemplation, falling short of being 'any evidence'". We conclude that the evidence did not raise the questions (1st), as to whether there was a debt owing by Hoffer, personally, to Kirk, and (2nd), that such a debt, if it existed, was agreed upon or regarded by both Hoffer and Kirk as a consideration for Hoffer's asserted promise to pay Kirk's draft. The rule applicable to the second question is stated in 10 Tex.Jur. 111 as follows:

"To make a thing a consideration for a contract it must have been agreed upon as a consideration, or in other words, it must have been offered by one party and accepted by the other as one element of the contract. Nothing is consideration which the parties do not regard as such at the time of entering into the contract, since their minds must meet upon every essential element of the contract, of which the consideration is one.

■ "There is a clear distinction between the motive inducing the execution of a contract and the consideration. The fact that there is a motive for making a promise does not amount to, or take the place of, a consideration."

This rule has been adopted by our Supreme Court. Missouri, K. & T. R. Co. v. Smith, 98 Tex. 47, 81 S.W. 22, 66 L.R.A. 741, 745, 107 Am.St.Rep. 607, and Johnson v. Breckenridge-Stephens Title Co., Tex. Com.App., 257 S.W. 223. See also First National Bank v. Shaw, Tex.Civ.App., 260 S.W. 309, 312; First National Bank v. Chandler, Tex.Civ.App., 58 S.W.2d 1056, 1057; Hardwicke v. Trinity Universal Ins. Co., Tex.Civ.App., 89 S.W.2d 500, 506; 10 C.J.S., Bills and Notes, § 148, p. 601; 17 C.J.S., Contracts, § 74, p. 427.

We conclude there was no evidence to support the issue submitted relative to Arnold Kirk's defense to Hoffer's cross-action, to wit, that the consideration of Hoffer's acceptance of the draft, as between Hoffer and Arnold Kirk, was an ancient debt owing by Hoffer to Arnold Kirk.

The only remaining point that need be considered is Appellants' fourth point to the effect that the court erred in instructing a verdict in favor of Mrs. J. P. Kirk. Hoffer asserts that since the evidence shows that a part of the proceeds of the draft were credited by the bank, under the instruction of Arnold Kirk, to the account of J. P. Kirk that Hoffer "made a prima facie case, not conclusively rebutted by the testimony of Arnold Kirk, an interested party, whose testimony the jury was entitled to disregard. Especially is this true since J. P. Kirk did not take the stand in her own behalf."

For present purposes we shall assume, but expressly do not decide, that Mrs. J. P. Kirk would have been liable to Hoffer for any part of the proceeds of the draft received and used by her.

As to Mrs. J. P. Kirk, Hoffer merely alleged that Arnold Kirk asked the bank to "deposit the remainder (meaning the proceeds of the draft, $600.00, less certain items amounting to $42.01, $41.05 and $75.-00, respectively) to the account of cross-defendant J. P. Kirk. That plaintiff bank followed such instructions. That upon receiving credit for * * * $441.94 * * * J. P. Kirk checked out such funds, thereby receiving, to the extent of her interest in the cash items * * * and the remainder of said * * * $600.00 * * * as used by her, the full proceeds of the draft."

Hoffer then alleged he received none of the proceeds of the draft, and, if liable to the bank, he was entitled to judgment over against "Arnold Kirk and J. P. Kirk, *who received the full proceeds thereof* * * *." (Italics ours).

Hoffer introduced a deposit slip showing a deposit of $441.94 to the credit of the J. P. Kirk account. Mrs. J. P. Kirk alleged she had no interest in the proceeds of the draft so deposited by the bank; that said account and money was the property of Arnold Kirk and that neither J. P. Kirk nor her husband, Frank Kirk, received any part of the $600 either directly or indirectly.

The testimony of Arnold Kirk and the bank's representative, Mr. Taylor, was to the effect that the "J. P. Kirk account" was Arnold Kirk's account. That Arnold had maintained such an account for a long time prior to this transaction. That Mrs. J. P. Kirk never checked on nor had anything to do with said account. She did not live in Eastland where the bank is located. Hoffer had alleged that Arnold Kirk instructed the bank to deposit $441.95 to the account of J. P. Kirk, and that the bank obeyed Arnold's instruction. After careful study of the statement of facts we find no evidence that Mrs. J. P. Kirk "received" or "checked out" or "used" said funds, or in any manner received or used any part of the proceeds of the draft. There is no evidence that she knew there was a J. P. Kirk account at said bank, or that a part of the proceeds of the draft had ever been deposited to such an account. Mr. Taylor was not a party to Hoffer's suit against J. P. Kirk; his bank could not have been affected by a judgment for Hoffer against Mrs. Kirk and he was not an interested party when testifying relative to this matter. The point incorrectly assumes that Arnold Kirk was the only witness who testified concerning the J. P. Kirk account. Mr. Taylor testified and there was documentary evidence introduced relative to this account.

Appellants' authorities are not questioned but are not deemed applicable. There is no presumption against Mrs. Kirk because she did not testify. There is no evidence that she knew anything about the account. Hoffer had the burden to show that Mrs. J. P. Kirk received or used the proceeds of the draft, as alleged by him. There is no evidence to that effect. The evidence of Taylor and Arnold Kirk is to the contrary. If they were both interested witnesses, which they are not, in the absence of some evidence that Mrs. J. P. Kirk received or used or checked out the proceeds of the draft, the wholly defensive testimony of Taylor and Arnold Kirk to the effect that the "J. P. Kirk account" was Arnold's, of long standing, that Mrs. Kirk had nothing to do with it, that Arnold checked out the funds, etc., though uncorroborated, would not have made an issue for the jury. Dixon v. Cargill, Tex.Civ.App., 104 S.W.2d 101, 103 (writ ref.). Also see Cochran v. Wool Growers Central Storage Co., Tex. Sup., 166 S.W.2d 904. If appellant relies upon the statutory presumption that it is Mrs. J. P. Kirk's "separate property" because deposited in the bank to the credit of the "J. P. Kirk account" (Art. 4622), and if said presumption is applicable to such a situation, then said presumption which "is not evidence but rather a rule of procedure" vanished or was " 'put to flight' when positive evidence to the contrary [was] introduced". Empire Fuel & Gas Co. v. Muegge, 135 Tex. 520, 528, 143 S.W. 2d 763, 767; Alfano v. International Harvestor Co. of America, Tex.Civ.App., 121 S.W.2d 466, 468; Watson v. Morgan, Tex. Civ.App., 91 S.W.2d 1133, 1134; McCutchen v. Purinton, 84 Tex. 603, 19 S.W. 710; 31 C.J.S., Evidence, § 117, p. 731; 20 Amer.Jur. 165.

Frank Kirk was made a defendant merely because the law required his joinder in a suit against his wife. He was a mere formal party. There is no evidence that he knew anything about the transaction. The court did not err in instructing a verdict for Mrs. J. P. Kirk and her husband, Frank Kirk.

The judgment on Hoffer's cross-action against Arnold Kirk is reversed and the cause as to them is remanded, as prayed for by Appellant. In all other respects the judgment is affirmed.